AO 106 (Rev. 04/10)  Application for a Search Warrant

CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

# UNITED STATES DISTRICT COURT

APR 13 2021

for the

Western District of Virginia    

JULIA C. DUDLEY, CLERK
BY: /s/
DEPUTY CLERK

In the Matter of the Search of                    )
*(Briefly describe the property to be searched*   )
*or identify the person by name and address)*     )   Case No. 1:21mj76
                                                  )
Information Assoc. with Facebook ID:danielle.walls3/  )
User Name:Danielle Chytka (Walls), that is stored at the  )
premises controlled by Facebook Inc., Menlo, CA   )

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____Northern_____ District of _____California_____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. §1040(a); §371 | Fraud in connection with major disaster benefits; Conspiracy to defraud the US |
| 18 U.S.C. §1341; §1349 | Mail fraud; Conspiracy to commit mail fraud |
| 18 U.S.C. §1028A | Aggravated Identity Theft |

The application is based on these facts:

See affidavit

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Joseph Harrilla*
*Applicant's signature*

Joseph Harrilla, Special Agent, USDOL-OIG
*Printed name and title*

**telephonically.**

Sworn to before me ~~and signed in my presence~~.

Date: 4/13/21

*Pamela Meade Sargent*
*Judge's signature*

City and state:  Abingdon, Virginia

Pamela Meade Sargent, United States Magistrate Judge
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF FACEBOOK, INC. ACCOUNT ASSOCIATED WITH<br><br>FACEBOOK USERNAME "Danielle.walls3", NAME DANIELLE CHYTKA (WALLS)<br><br>WHICH IS IN THE POSSESSION OF OR UNDER THE CONTROL OF FACEBOOK, INC., MENLO PARK, CALIFORNIA 94025 | Case No. _____<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Joseph Harrilla, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I make this affidavit in support of an application for a search warrant for information associated with a certain Facebook username that is stored at premises owned, maintained, controlled, or operated by Facebook Inc. ("Facebook"), a social networking company headquartered in Menlo Park, California.  The information to be searched is described in the following paragraphs and in Attachment A.  This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Facebook to disclose to the government records and other information pertaining to stored electronic communications in its possession, pertaining to the subscriber or customer associated with the user ID.

2.      I have been a Special Agent with the United States Department of Labor, Office of Inspector General ("DOL-OIG") since 2009.  I am currently assigned to the Roanoke Field

Office.  I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center.  I have a Master of Science in Administration, and a Financial Crimes Investigator Certificate.  I have more than 20 years' experience conducting criminal investigations involving matters of fraud, theft, conspiracy, false statements, and forgery.  I am a law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), in that I am empowered by law to conduct investigations and to make arrests for federal felony offenses.  While assigned to the Roanoke Field Office, I have conducted criminal investigations of individuals, organizations and businesses related to the Commonwealth of Virginia ("VA") Unemployment Insurance ("UI") Benefit Program and the Pandemic Unemployment Assistance Program ("PUA").

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.      Based on your affiant's training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. §§ 371 (Conspiracy to commit an offense against the US or to defraud the US), 1040(a)(1) (scheme to defraud major disaster or emergency benefits), 1040(a)(2) (false statement regarding major disaster or emergency benefits), 1341 (mail fraud), 1349 (conspiracy to commit mail fraud), and 1028A (Aggravated Identity Theft) have been committed by LEELYN DANIELLE CHYTKA ("CHYTKA") and other persons, both known and unknown.  There is also probable cause to search the information described in Attachment A for evidence of these crimes and contraband or fruits of these crimes, as described in Attachment B.

2

## BACKGROUND: CARES Act and Pandemic Benefits

5.      This investigation involves a conspiracy to defraud the United States of Pandemic Unemployment Assistance benefits by CHYTKA, and others, many of whom were incarcerated at the time the claims for benefits were filed.

6.      Unemployment Insurance (UI) is a state-federal program that provides monetary benefits to eligible lawful workers. Although state workforce agencies (SWAs) administer their respective UI programs, they must do so in accordance with federal laws and regulations. UI payments (benefits) are intended to provide temporary financial assistance to lawful workers who are unemployed through no fault of their own.   Each state sets its own additional requirements for eligibility, benefit amounts, and length of time benefits can be paid. Generally, UI weekly benefit amounts are based on a percentage of your earnings over a base period. In the Commonwealth of Virginia, the Virginia Employment Commission (VEC) administers the UI program.

7.      On March 13, 2020, the then President declared the ongoing Coronavirus Disease 2019 ("COVID-19") pandemic of sufficient severity and magnitude to warrant an emergency declaration for all states, tribes, territories, and the District of Columbia pursuant to section 501 (b) of the Robert T. Stafford Disaster Relief and Emergency Assistance Act, 42 U.S.C. 5121-5207 (the "Stafford Act").

8.      On March 18, 2020, the then President signed the Families First Coronavirus Response Act ("FFCRA") into law. The FFCRA provides additional flexibility for state UI

3

agencies and additional administrative funding to respond to the COVID-19 pandemic. The Coronavirus Aid, Relief, and Economic Security ("CARES") Act was signed into law on March 27, 2020. It expands states' ability to provide UI for many workers impacted by COVID-19, including for workers who are not ordinarily eligible for UI benefits. The CARES Act provided for three new UI programs:  Pandemic Unemployment Assistance ("PUA"); Federal Pandemic Unemployment Compensation ("FPUC");  and  Pandemic  Emergency  Unemployment Compensation ("PEUC").

9.      The first program, PUA, provides for up to 39 weeks of benefits to individuals who are self-employed, seeking part-time employment, or otherwise would not qualify for regular UI or extended benefits under state or federal law or PEUC under section 2107 of the CARES Act. Coverage includes individuals who have exhausted all rights to regular UI benefits or extended benefits under state or federal law or PEUC.   Under the PUA provisions of the CARES Act, a person who is a business owner, self-employed worker, independent contractor, or gig worker can qualify for PUA benefits administered by VEC if he/she previously performed such work in Virginia and is unemployed, partially unemployed, unable to work, or unavailable to work due to a COVID-19 related reason. A PUA claimant must answer various questions to establish his/her eligibility for PUA benefits. The claimant must provide his/her name, Social Security Number, and mailing address. The claimant must also identify a qualifying occupational status and COVID-19 related reason for being out of work.  The eligible timeframe to receive PUA is from weeks of unemployment beginning on or after January 27, 2020 through December 31, 2020.

4

10.     The second program, PEUC, is a state-federal program that provides for up to 13 weeks of benefits to individuals who have exhausted regular UI under state or federal law, have no rights to regular UI under any other state or federal law, are not receiving UI under the UI laws of Canada, and are able to work, available for work, and actively seeking work. Under this program, states must offer flexibility in meeting the "actively seeking work" requirement if individuals are unable to search for work because of COVID-19, including because of illness, quarantine, or movement restriction. The eligible timeframe to receive PEUC includes weeks of unemployment beginning after the respective state has an established agreement with the federal government through December 31, 2020. The earliest being April 5, 2020.

11.     The third program, FPUC, provides individuals who are collecting regular UI, PEUC, PUA, and several other forms of UC with an additional $600 per week. The eligible timeframe to receive FPUC was from weeks of unemployment beginning after the respective state had an established agreement with the federal government through July 31, 2020. The earliest being April 5, 2020.

12.     On August 8, 2020, after FPUC expired, the then President signed a Presidential Memorandum authorizing FEMA to use disaster relief funds pursuant to Section 408 Other Needs Assistance of the Stafford Act to provide supplemental payments for lost wages to help ease the financial burden on individuals who were unemployed as a result of COVID-19. The "Lost Wages Assistance Program" ("LWAP") served as a temporary measure to provide an additional $300 per week via a total of $44 billion in FEMA funds. The period of assistance for LWAP is August 1, 2020 to December 27, 2020, or termination of the program, whichever is sooner.

5

13.     In total, more than $300 billion in additional federal funds for UI have been appropriated in 2020.

14.     The PUA, FPUC, and LWAP programs (collectively, "pandemic unemployment benefits") are administered by the various states, including the Commonwealth of Virginia, but their benefits are funded by the federal government.  In order to receive pandemic benefits, an applicant must access a website maintained by the Commonwealth of Virginia and file a claim.

15.     Individuals are only eligible for pandemic unemployment benefits if they are unemployed for reasons related to the COVID-19 pandemic and are otherwise available to work.

16.     Once an applicant is at the website, the applicant is required to enter personal identifying information including their name, date of birth, social security number, email address, phone number, and physical address.  An applicant is then required to answer a series of questions to determine their eligibility and payment amount.

17.     Upon completion, the application is submitted to the VEC.  If approved, the applicant can choose whether to have the pandemic benefits deposited directly into a bank account of their choosing, or the funds can be loaded on a pre-paid debit card which is then shipped to the applicant via United States Postal Service to the address listed on their application.

18.     In or around June 2020, the VEC began reviewing UI and PUA claims to identify fraudulent claims.  By August 2020, VEC officials had learned from other states that inmates in correctional facilities were receiving UI benefits.  Incarcerated individuals are not available for employment so as long as their unemployment was a result of their incarceration and not related to COVID-19, nor are they able to seek full time employment.  These individuals are

6

unemployed due to their own criminal conduct and not due to COVID-19 reasons. For those reasons, they are not eligible to receive UI and PUA benefits. Consequently, VEC obtained a list of approximately 39,000 inmates housed by the Virginia Department of Corrections ("VADOC") and cross-matched the Virginia UI and PUA claims to people who were shown to be claimants on the inmate list. The analysis revealed over 6,000 claims filed on the behalf of inmates in Virginia, totaling over $85 million in paid claims.

## **PROBABLE CAUSE**

19.    CHYTKA was interviewed by investigators on January 26, 2021 while incarcerated at the Lincoln County Detention Center located in Lincolnton, North Carolina. After waiving her Miranda rights, CHYTKA confessed to filing fraudulent claims for pandemic unemployment benefits for herself, Jeff TACKETT, Greg TACKETT and at least thirty-four (34) other individuals associated with the address of 108 Twin Circle Drive, Lebanon, Virginia.[1] In a recorded interview, CHYTKA told investigators the following:

  a.   In May, 2020, CHYTKA discovered that she could make money by applying for pandemic unemployment benefits via the VEC website. CHYTKA sought to obtain pandemic unemployment benefits even though, as she then well knew, she was not eligible to receive such benefits. CHYTKA was employed by a company called "Appen" at the time of her filing and was not otherwise eligible for pandemic unemployment benefits.

---

[1] Consistent with her statement to investigators, on March 18, 2021, CHYTKA entered a plea of Guilty with the United States District Court for the Western District of Virginia to charges including Conspiracy to Defraud the United States (18 U.S.C. § 371), Conspiracy to Commit Mail Fraud (18 U.S.C. § 1349), and Aggravated Identity Theft (18 U.S.C. § 1028A). Your affiant considers this to be strong support as to the reliability of the statements she provided to investigators.

b. On May 11, 2020, CHYTKA filed a claim with the VEC. The claim was processed and approved.

c. Shortly after her claim was approved, CHYTKA received via United States Post a monetary determination letter, PIN code, and a Mastercard pre-paid debit card in her name at 108 Twin Circle Drive, Lebanon, VA 24266.

d. In order to continue to receive weekly deposits to the pre-paid debit card, CHYTKA made subsequent weekly re-certifications using her computer by accessing the VEC website.

e. The filing of this fraudulent claim resulted in not less than $17,688.00 being paid to CHYTKA, including both PUA and LWAP payments.

f. With the assistance of other individuals, including Jeff TACKETT and Greg TACKETT, CHYTKA filed every claim for pandemic unemployment benefits for those individuals associated with 108 Twin Circle Drive.

g. CHYTKA classified the other thirty-four (34) individuals into three general categories: 1) Inmates at the SWVRJA-Duffield whose personal identification information was passed on to her by Jeff TACKETT so that CHYTKA could file a fraudulent claim with VEC; 2) Personal friends of CHYTKA's and the TACKETTs' who provided CHYTKA with their personal identification information so that CHYTKA could file their fraudulent claims with the VEC, even though they were not eligible to receive such benefits; and 3) Acquaintances of Greg TACKETT's who provided CHYTKA with personal identification information so that CHYTKA could file fraudulent claims with the VEC, even

8

though they were not eligible to receive such benefits, in exchange for Greg
TACKETT providing them with controlled substances.

h. After successfully filing for pandemic unemployment benefits on behalf of
inmates, CHYTKA received via United States Post monetary letters, PIN codes,
and prepaid debit card in each inmate's name at 108 Twin Circle Drive, Lebanon,
VA 24266. CHYTKA and Greg TACKETT would then use the debit card to
their own benefit, and CHYTKA would occasionally send money to the inmates'
commissary accounts in jail as directed by Jeff TACKETT. CHYTKA only
loaded the inmates' commissary accounts if Jeff TACKETT directed her to do so.

i. CHYTKA told investigators that on or around the dates their respective claims
were filed with the VEC, CHYTKA's and Greg TACKETT's family, friends, and
acquaintances met with CHYTKA at her residence located at 108 Twin Circle
Drive, Lebanon, VA. As detailed further below, while co-conspirators were
present at the residence, individuals provided CHYTKA with his/her Personal
Identifiable Information ("PII") for the purpose of CHYTKA filing a fraudulent
claim. CHYTKA entered this information into the VEC website and filed the
application due to her familiarity with the system. CHYTKA told investigators
that some co-conspirators (Veronica MULLINS, Danny MULLINS Jr., Melissa
HAYES, Larry WHITED, and others) communicated with CHYTKA via
Facebook Messenger regarding their unemployment claims as well, providing
their PII and the PII of other co-conspirators.

j. After successfully filing these claims, CHYTKA received via United States Post a
monetary determination letter, PIN code, and a Mastercard debit card in each

9

individual's name at 108 Twin Circle Drive, Lebanon, VA 24266. CHYTKA and Greg TACKETT usually kept these cards and used the money to their own benefit, while providing co-conspirators with cash, illegal drugs, or other items of value (including providing some individuals with a vehicle).

k. In order to continue receiving weekly deposits to the pre-paid debit card, CHYTKA made subsequent weekly certifications on the individuals' behalf.

l. CHYTKA filed all claims electronically using her personal computer from her home at 108 Twin Circle Drive, Lebanon, VA 24266

m. CHYTKA told investigators everyone for whom she filed fraudulent claims knew she was filing fraudulent unemployment claims, and if they say they thought they were getting stimulus, "they are lying." CHYTKA said "they…they knew it was fraud pretty much…nobody thought it was stimulus. Everybody was like 'oh – I'm gonna get my stimulus *on top* of this."

20.     Pursuant to her guilty plea on March 18, 2021, CHYTKA was interviewed again by investigators on April 1, 2021 while incarcerated at the South West Regional Jail, Abingdon, Virginia. In a recoded interview and in the presence of her attorney, CHYTKA told investigators the following:

a. CHYTKA often communicated with co-conspirators via Facebook (including Facebook Messenger, an embedded Facebook communications application) concerning the filing of their pandemic unemployment claims with the VEC.

b. During the interview with investigators, CHYTKA logged into her Facebook account and accessed Facebook Messenger. CHYTKA offered to show investigators several communications between co-conspirators and CHYTKA

10

regarding the filing of their claims. CHYTKA showed investigators messages from Veronica MULLINS wherein Veronica MULLINS provided the PII and address for herself and others so that CHYTKA could file for pandemic unemployment claims. In the messages, Veronica MULLINS offered payment to CHYTKA in exchange for her filing the pandemic unemployment claims for her, and several other individuals, and offered specific instructions to CHYTKA for filing claims including bank account and routing numbers where UI/PUA funds were to be deposited.

c. CHYTKA showed investigators some messages from co-conspirators (Veronica MULLINS, Melissa HAYES) who provided PII for individuals who were *not* aware that their information was being used. In this respect, co-conspirators forwarded the personal information of friends and family members who, investigation has determined, were unaware that their information had been used.

d. CHYTKA also showed investigators messages from Melissa HAYES where CHYTKA and HAYES discussed the filing of pandemic unemployment claims for HAYES, Darrell DAVIS, Melinda DAVIS, Larry WHITED, and other co-conspirators.

e. CHYTKA told investigators there were others with whom she communicated via Facebook messenger as well.

f. After logging in to her Facebook account and directing investigators to her Facebook Messenger app, your affiant noted the account Facebook ID associated with CHYTKA's account as being "danielle.walls3". The public facing name for this account was listed as "Danielle Chytka (Walls)" and showed profile picture

11

of CHTKA and Greg TACKETT, known by your affiant to be CHYTKA's boyfriend.

### Identification of Facebook Page

21.     A Facebook page in the name of "Danielle Chytka (Walls)" with Facebook ID of: danielle.walls3 is publicly available.  When interviewed by federal investigators on April 1, 2021, CHYTKA logged into this account and identified it as being her personal Facebook account.

22.     CHYTKA gave investigators permission to review her Facebook Messenger account.

23.     A preservation request was made on CHYTKA's Facebook account in order to preserve the stored electronic communications.

### TECHNICAL BACKGROUND

24.     Facebook owns and operates a free-access social networking website of the same name that can be accessed at http://www.facebook.com.  Facebook allows its users to establish accounts with Facebook, and users can then use their accounts to share written news, photographs, videos, and other information with other Facebook users, and sometimes with the general public.

25.     Facebook asks users to provide basic contact and personal identifying information to Facebook, either during the registration process or thereafter.  This information may include the user's full name, birth date, gender, contact e-mail addresses, Facebook passwords, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a user identification number to each account.

12

26.     Facebook users may join one or more groups or networks to connect and interact with other users who are members of the same group or network.  Facebook assigns a group identification number to each group.  A Facebook user can also connect directly with individual Facebook users by sending each user a "Friend Request."  If the recipient of a "Friend Request" accepts the request, then the two users will become "Friends" for purposes of Facebook and can exchange communications or view information about each other.  Each Facebook user's account includes a list of that user's "Friends" and a "News Feed," which highlights information about the user's "Friends," such as profile changes, upcoming events, and birthdays.

27.     Facebook allows users to upload photos and videos, which may include any metadata such as location that the user transmitted when s/he uploaded the photo or video.  It also provides users the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is tagged in a photo or video, he or she receives a notification of the tag and a link to see the photo or video.  For Facebook's purposes, the photos and videos associated with a user's account will include all photos and videos uploaded by that user that have not been deleted, as well as all photos and videos uploaded by any user that have that user tagged in them.

28.     Facebook users can exchange private messages on Facebook with other users.  Those messages are stored by Facebook unless deleted by the user.  Facebook users can also post comments on the Facebook profiles of other users or on their own profiles; such comments are typically associated with a specific posting or item on the profile.  In addition, Facebook has a chat feature that allows users to send and receive instant messages through Facebook Messenger.  These chat communications are stored in the chat history for the account.  Facebook also has Video and Voice Calling features, and although Facebook does not record the calls themselves, it does keep records of the date of each call.

13

29.     Each Facebook account has an activity log, which is a list of the user's posts and other Facebook activities from the inception of the account to the present.  The activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend.  The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

30.     Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP address.  These logs may contain information about the actions taken by the user ID or IP address on Facebook, including information about the type of action, the date and time of the action, and the user ID and IP address associated with the action.  For example, if a user views a Facebook profile, that user's IP log would reflect the fact that the user viewed the profile, and would show when and from what IP address the user did so.

31.     Social networking providers like Facebook typically retain additional information about their users' accounts, such as information about the length of service (including start date), the types of service utilized, and the means and source of any payments associated with the service (including any credit card or bank account number).  In some cases, Facebook users may communicate directly with Facebook about issues relating to their accounts, such as technical problems, billing inquiries, or complaints from other users.  Social networking providers like Facebook typically retain records about such communications, including records of contacts between the user and the provider's support services, as well as records of any actions taken by the provider or user as a result of the communications.

32.     As explained herein, information stored in connection with a Facebook account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element

or alternatively, to exclude the innocent from further suspicion.  In my training and experience, a Facebook user's IP log, stored electronic communications, and other data retained by Facebook, can indicate who has used or controlled the Facebook account.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, profile contact information, private messaging logs, status updates, and tagged photos (and the data associated with the foregoing, such as date and time) may be evidence of who used or controlled the Facebook account at a relevant time.  Further, Facebook account activity can show how and when the account was accessed or used.  For example, as described herein, Facebook logs the Internet Protocol (IP) addresses from which users access their accounts along with the time and date.  By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the account access and use relating to the crime under investigation.  Such information allows investigators to understand the geographic and chronological context of Facebook access, use, and events relating to the crime under investigation.  Additionally, Facebook builds geo-location into some of its services.  Geo-location allows, for example, users to "tag" their location in posts and Facebook "friends" to locate each other.  This geographic and timeline information may tend to either inculpate or exculpate the Facebook account owner.  Last, Facebook account activity may provide relevant insight into the Facebook account owner's state of mind as it relates to the offense under investigation.  For example, information on the Facebook account may indicate the owner's motive and intent to commit a crime (e.g., information indicating a plan to commit a crime), or consciousness of guilt (e.g., deleting account information in an effort to conceal evidence from law enforcement).

15

33.     Therefore, Facebook servers are likely to contain all the material described above, including stored electronic communications and information concerning subscribers and their use of Facebook, such as account access information, transaction information, and other account information.

## INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED

34.     I anticipate executing this warrant under the Electronic Communications Privacy Act, in particular 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the government copies of the records and other information (including the content of communications) particularly described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

## CONCLUSION

35.     Based on the foregoing, I request that the Court issue the proposed search warrant. Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the computer systems in the control of Facebook there exists evidence of a crime and contraband or fruits of a crime. Accordingly, a search warrant is requested.

36.     Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving it on Facebook. Because the warrant will be served on Facebook, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

37.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated. 18 U.S.C. § 2711(3)(A)(i).

Respectfully submitted,

Joseph Harrilla
Special Agent
United States Department of Labor
Office of Inspector General

Subscribed and sworn to before me on ~~telephonically~~ April 13 _____, 2021

UNITED STATES MAGISTRATE JUDGE

18

**ATTACHMENT A**

**Property to Be Searched**

This warrant applies to information associated with the Facebook user name of "Danielle Chytka (Walls)" and the Facebook ID of "danielle.walls3", that is stored at premises owned, maintained, controlled, or operated by Facebook Inc., a company headquartered in Menlo Park, California.

## ATTACHMENT B

### Particular Things to be Seized

I.    **Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook Inc. ("Facebook"), regardless of whether such information is located within or outside of the United States, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Facebook is required to disclose the following information to the government for each user ID listed in Attachment A:

(a)    All contact and personal identifying information, including: full name, user identification number, birth date, gender, contact e-mail addresses, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.]]

(b)    All activity logs for the account and all other documents showing the user's posts and other Facebook activities **from May 1, 2020 to Present;**

(c)    All photos and videos uploaded by that user ID and all photos and videos uploaded by any user that have that user tagged in them **from May 1, 2020 to Present**, including Exchangeable Image File ("EXIF") data and any other metadata associated with those photos and videos;

(d)    All profile information; News Feed information; status updates; videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification

numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications;

(e)    All records or other information regarding the devices and internet browsers associated with, or used in connection with, that user ID, including the hardware model, operating system version, unique device identifiers, mobile network information, and user agent string;

(f)    All other records and contents of communications and messages made or received by the user **from May 1, 2020 to Present,** including all Facebook Messenger activity, private messages, chat history, video and voice calling history, and pending "Friend" requests;

(g)    All "check ins" and other location information;

(h)    All IP logs, including all records of the IP addresses that logged into the account;

(i)    All records of the account's usage of the "Like" feature, including all Facebook posts and all non-Facebook webpages and content that the user has "liked";

(j)    All information about the Facebook pages that the account is or was a "fan" of;

(k)    All past and present lists of friends created by the account;

(l)    All records of Facebook searches performed by the account **from May 1, 2020 to Present;**

(m)    All information about the user's access and use of Facebook Marketplace;

(n)    The types of service utilized by the user;

2

(o)   The length of service (including start date) and the means and source of any payments associated with the service (including any credit card or bank account number);

(p)   All privacy settings and other account settings, including privacy settings for individual Facebook posts and activities, and all records showing which Facebook users have been blocked by the account;

(q)   All records pertaining to communications between Facebook and any person regarding the user or the user's Facebook account, including contacts with support services and records of actions taken.

Facebook is hereby ordered to disclose the above information to the government within **14 Days** of issuance of this warrant.

3

## II.     Information to be seized by the government

All information described above in Section I that constitutes evidence of violations of 18 U.S.C. §§ 371 (Conspiracy to commit an offense against the US or to defraud the US), 1040(a)(1) (scheme to defraud major disaster or emergency benefits), 1040(a)(2) (false statement regarding major disaster or emergency benefits), 1341 (mail fraud), 1349 (conspiracy to commit mail fraud), and 1028A (Aggravated Identity Theft) involving user name "Danielle Chytka (Walls)", Facebook ID: danielle.walls3, since May 1, 2020 including information pertaining to the following matters:

(a) Communication among "Danielle Chytka (Walls)" and others concerning the filing of claims for pandemic unemployment benefits, including Unemployment Insurance and Pandemic Unemployment Assistance.

(b) Evidence indicating how and when the Facebook account was accessed or used, to determine the chronological and geographic context of account access, use, and events relating to the crime under investigation and to the Facebook account owner;

(c) Evidence indicating the Facebook account owner's state of mind as it relates to the crime under investigation;

(d) The identity of the person(s) who created or used the user ID, including records that help reveal the whereabouts of such person(s).

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct.  I am employed by Facebook, and my title is

_____.  I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved.  I state that the records attached hereto are true duplicates of the original records in the custody of Facebook.  The attached records consist of _____ **[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**.  I further state that:

a.      all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Facebook, and they were made by Facebook as a regular practice; and

b.      such records were generated by Facebook's electronic process or system that produces an accurate result, to wit:

1.      the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Facebook in a manner to ensure that they are true duplicates of the original records; and

2.      the process or system is regularly verified by Facebook, and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____     _____
Date                                Signature

6